OPINION
{¶ 1} Appellant, Singer Steel Company ("Singer") appeals the November 22, 2002 judgment entry of the Portage County Court of Common Pleas adopting the "Magistrate's Decision and Journal Entry" and entering judgment for Singer in the amount of $4,322.70. For the following reasons, we reverse the lower court's decision.
 {¶ 2} Singer is a steel producer located in Streetsboro, Ohio. In 1999, Singer began supplying processed, slit coil steel to appellee, H J Tool Die Co., Inc. ("H J"), in Bohemia, New York, for the manufacture of automobile parts. Singer would ship the steel in varying sizes to H J approximately twice a month under a blanket purchase order. Upon receipt of the steel, H J would issue a check to Singer for the cost of the steel. The check was usually post-dated sixty days.
 {¶ 3} On or about October 30, 2000, Singer shipped to H J $12,363.56 worth of steel under invoice no. 0106171 ("the October shipment"). H J issued a check to Singer for $12,363.56, post-dated to January 2, 2001. Upon inspection, H J found the steel nonconforming as to the steel's thickness. H J notified Singer of the problem. Having learned that portions of the steel shipped were of the proper thickness, H J used whatever portion of the steel it found to be conforming and set aside the remainder. H J also stopped payment on the check issued to Singer.
 {¶ 4} On or about November 15, 2000, Singer made another shipment to H J of $12,731.01 of steel under invoice no. 0106456 ("the November shipment"). H J claims that this shipment was also nonconforming and that it rejected the entire shipment. H J never issued a check to Singer for the November shipment.
 {¶ 5} Subsequent to the shipment of steel in November, the business relationship between Singer and H J terminated. Singer made no further shipments of steel to H J.
 {¶ 6} On December 10, 2000, Singer sales representative Gus Mehallis ("Mehallis") went to New York to inspect the rejected steel and discuss the problem with Luis Ortiz, the general manager of H J. Returning to Singer, Mehallis met with Singer's vice-president, Eric Shaw ("Shaw"), and controller, Chester Simmons ("Simmons"). According to Mehallis' testimony, it was agreed at this meeting to settle affairs with H J by having H 
J return all unused steel accumulated in the course of its relationship with Singer and by sending a final statement to H 
J for $4,322.70. Shaw and Simmons recalled meeting with Mehallis in December but did not recall agreeing to a settlement with H 
J. Simmons testified that Mehallis asked him to hold H J's check for the October shipment for an additional two weeks before cashing it.
 {¶ 7} In January 2001, Singer attempted to negotiate the $12,363.56 check issued by H J for the October 2000 shipment. The bank refused to honor the check on account of the stop payment order and the check was returned on January 29, 2001. Simmons attempted to contact H J officials about the returned check, but his calls were not returned. In April 2001, H J returned all rejected steel that it had received from Singer. According to Singer's records, the steel returned amounted to 55,706 pounds gathered from several different shipments to H J, including invoice nos. 0106171 and 0106456. Singer credited $15,483.20 to H J's account for the returned steel. Sometime after that, Singer issued several statements to H J for $4,322.70, referencing invoice no. 0106456. H J issued a check to Singer for this amount dated June 1, 2001. The memo portion of this check stated, "Inv. 0106456 P.I.F. [i.e., paid in full]." Disputing that this figure represented the balance due on H J's account, Singer has not attempted to negotiate this check.
 {¶ 8} Litigation between Singer and H J commenced on August 13, 2001, with Singer filing a complaint against H J to recover monies owed. On December 31, 2001, Singer filed an amended complaint. In the amended complaint, Singer alleged that H J owed Singer $12,363.56 for the October steel shipment, $4,322.70 indicated on the statements issued to H J, and money "for additional purchases of steel including, but not limited to," the purchase of $4,712.36 of steel in July 1999.
 {¶ 9} The matter was tried before a magistrate on June 18, 2002. At trial, Singer stated that it was seeking $20,529.53 from H J. In support of the claim, Singer introduced its business records detailing the entire history of its relationship with H 
J beginning in July 1999. From July 1999 until November 2000, Singer shipped a total of $358,192.31 of steel to H J. During that time, Singer received $322,179.57 in payment from H J, leaving a balance of $36,012.74. That balance represents $12,363.56 for the October shipment of steel, $12,731.01 for the November shipment of steel, and $10,918.17 owed for prior steel shipments in the course of Singer's relationship with H J. After crediting $15,483.20 to H J's account for the steel returned in April 2001, a balance remains owing of $20,529.54.
 {¶ 10} The magistrate found for Singer in the amount of $4,322.70 and denied the rest of Singer's claims. Singer filed objections to the magistrate's decision. On November 22, 2002, the trial court overruled Singer's objections and entered judgment in favor of Singer in the amount of $4,322.70. Singer timely brings this appeal.
 {¶ 11} Singer raises four assignments of error:
 {¶ 12} "[1.] The trial court erred in adopting the Magistrate's decision without independently reviewing it.
 {¶ 13} "[2.] The trial court erred in failing to award fees when granting Appellant's discovery motions.
 {¶ 14} "[3.] The trial court erred on the merits in adopting the Magistrate's Decision.
 {¶ 15} "[4.] The trial court erred in that its judgment is against the manifest weight of the evidence."
 {¶ 16} Singer argues under its first assignment of error that the trial court failed to conduct a de novo, independent review of the magistrate's findings and decision as required by Civ.R. 53(E)(4)(b). Singer notes that the trial court's judgment entry fails to rule on Singer's request for discovery sanctions. The request for sanctions was not part of the magistrate's decision. The trial court's failure to address it, therefore, is evidence that the trial court did not consider the substance of that decision. Singer also notes the "comparative haste" of the trial court in adopting the magistrate's decision, seven days after the filing of H J's response to Singer's objections. Finally, Singer concludes that if the trial court had conducted an independent review of the hearing transcript, it would not have adopted the magistrate's decision.
 {¶ 17} In the present case, the trial court adopted the "conclusions, findings, and recommendations" of the magistrate as its own. In its judgment entry adopting the magistrate's decision, the trial court stated: "Upon consideration of the `Magistrate Decision and Journal Entry,' the Court determines that there is no error of law or other defect on the face of said determination. The Court further finds that the `Magistrate Decision and Journal Entry' contains sufficient findings of fact and conclusions of law to allow the Court to make an independent analysis of the issues and to apply the appropriate rules of law in making a final decision and judgment entry in this matter."
 {¶ 18} This statement indicates that the trial court did conduct an independent, de novo review of the magistrate's decision as contemplated by Civ.R. 53. Absent anything in the record to contradict the trial court's statement that it conducted an independent, de novo review of the magistrate's decision, we will presume that it complied with its duty under Civ.R. 53. Pauley v. Pauley, 2nd Dist. No. 2001-CA-49, 2002-Ohio-1210, 2002 Ohio App. LEXIS 984, at *7.
 {¶ 19} Singer's arguments fail to rebut this presumption. The fact that the trial court did not rule on Singer's motion for sanctions is simply irrelevant in regards to whether the trial court conducted an effective independent review of the magistrate's decision. As Singer itself acknowledges, discovery sanctions were not part of the magistrate's decision.
 {¶ 20} Nor do we accept Singer's argument that the "comparative haste" of the trial court's adoption of the magistrate's decision precluded an independent review. The magistrate's decision was filed with court on July 18, 2002. Singer sought, and was granted, two extensions of time in which to obtain transcripts of the proceedings before the magistrate. These transcripts were filed with the court on September 12, 2002. Singer filed its objections on September 30, 2002. Therefore, the trial court possessed both the magistrate's decision and a transcript of the proceedings for over two months before issuing its decision to adopt the magistrate's decision. Singer's first assignment of error is overruled.
 {¶ 21} In Singer's second assignment of error, it argues that the trial court erred by failing to award attorney's fees, pursuant to Civ.R. 37(D), for Singer's successful prosecution of a discovery dispute with H J. On remand from this court, the trial court determined that Singer was entitled to $3,094.00 for attorney's fees incurred by Singer in compelling discovery against H J. Singer's second assignment of error, therefore, is moot.
 {¶ 22} In the third and fourth assignments of error, Singer claims that the trial court erred by adopting the magistrate's decision and that the decision itself was against manifest weight of the evidence. Since our analysis under either argument is the same, these two assignments of error will be addressed together. "The decision to adopt, reject or modify a [magistrate]'s report will not be reversed on appeal unless the decision was an abuse of discretion, which has been defined as `* * * more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.'" Wade v. Wade
(1996), 113 Ohio App.3d 414, 419, quoting Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 23} To arrive at the judgment of $4,322.70, the magistrate made the following findings. First, the magistrate found that Singer was not entitled to $4,712.37 for the July 1999 shipment of steel. At the hearing, Singer abandoned this claim by acknowledging that H J had paid for the July 1999 shipment and that, through an accounting error on Singer's part, H J was not properly credited for this payment. The trial court, therefore, did not abuse its discretion by adopting this finding. Singer did not, however, include this $4,712.37 in its calculation of the $20,529.54 that it claims is owed by H J. This finding, therefore, has no real relevance to the outcome of this appeal.
 {¶ 24} The second finding made by the magistrate was that the October 2000 shipment of steel, invoice no. 0106171, for $12,363.56, was subject to a settlement for $4,322.70 and that the November 2000 shipment of steel, invoice no. 0106456, for $12,731.01, was rejected completely. Accordingly, the magistrate concluded that H J only owes Singer $4,322.70. Since the magistrate's finding is not supported by the evidence in the record, we hold that the trial court erred and abused its discretion by adopting this finding.
 {¶ 25} In support of its finding, the magistrate noted that, although the October 2000 shipment was initially rejected as nonconforming, H J was able to use part of the steel shipped in that order. The magistrate also found that Mehallis went to New York to discuss the problem with H J officials. After Mehallis returned to Ohio and met with Shaw and Simmons, the magistrate continued, "[i]t was decided that HJ could pay Singer $4,322.70 for the steel it used from that shipment, and the remainder would be returned to Singer[;] * * * HJ then stopped payment on their check to Singer for the steel, Invoice #0106171 in the amount of $12,363.56." Although Singer attempted to negotiate this check anyway, the magistrate stated that Singer sent H J "an invoice dated November 16, 2000, titled a `statement' amounting to $4,322.70."
 {¶ 26} Thereafter, the magistrate found that Singer sent the November 2000 shipment, which H J rejected in its entirety as nonconforming.
 {¶ 27} The magistrate found that H J returned all the rejected steel it had accumulated back to Singer in April 2001. According to the magistrate, this included "the unused portions of the shipment subject to the settlement (Invoice #0106171), the whole shipment deliver[ed] and rejected in mid-November (Invoice #0106456), and other odds and ends of previously rejected steel." The magistrate noted that Singer weighed and valued the returned steel and credited H J's account accordingly, not realizing that the return was subject to a settlement. The magistrate concluded that "[r]egardless of the weight of steel returned to Singer from the nonconforming shipment * * *, HJ was only required to pay Singer the settlement amount of $4,322.70 and was thereafter relieved of paying Invoice #0106171 amounting to $12,363.56."
 {¶ 28} The only evidence to support the finding that the October shipment was subject to a $4,322.70 settlement is the testimony of Mehallis. Mehallis testified that the $4,322.70 figure was agreed upon at the meeting with Shaw and Simmons in mid-December, just after his return from New York. Mehallis further testified that this figure was based on the weight of the steel that H J was accepting, i.e., H J was accepting $4,322.70 worth of steel and would be returning the remaining $8,040.86. Mehallis then testified that he called Ortiz at H J that he was going to receive an invoice for $4,322.70 representing the balance due on the October shipment.
 {¶ 29} Mehallis' testimony that the $4,322.70 figure was reached at the December meeting with Shaw and Simmons is not credible. In the first place, neither Shaw nor Simmons can recall reaching a settlement at that meeting. In the second place, the $4,322.70 was supposed to represent the amount of steel that H 
J used. But Singer could not have known how much of the steel H 
J used until it received the unused steel back from H J in April 2001. The magistrate found that it did not matter how much steel H J returned, because the October shipment was subject to a settlement figure fixed in December 2000. This finding contradicts the testimony of Mehallis that the $4,322.70 figure represented that steel that H J actually used. In fact, there is no evidence in the record that the $4,322.70 figure was determined until after H J returned the steel in April 2001.
 {¶ 30} H J did not issue the check for the $4,322.70 purportedly agreed to in December 2000 until June 2001. The testimony of Ortiz, H J's general manager, does not support a finding that the $4,322.70 was reached in December 2000. When asked about the sequence of events that led him to issue the $4,322.70 check in June 2001, Ortiz replied, "[t]hat's what the statement said, okay. I did not agree with the number. I didn't want to pay them anything, but after they kept sending it, they sent it three months in a row. After a while I told my accounting people pay it and be done with it."
 {¶ 31} According to the magistrate, the "statement" mentioned by Ortiz was actually an "invoice dated November 16, 2000."[1] This assertion has no support in the record. There is a statement in the record, printed August 1, 2001, for $4,322.70. This statement references invoice no. 0106456, issued November 16, 2000. This statement, however, does not accurately reflect the November 16, 2000 invoice as the magistrate concluded. The actual November 16, 2000 invoice, no. 0106456, is in the record and is for the amount of $12,731.01, the price of the steel shipped in November. At the hearing, Singer records custodian, Jennifer Hammer ("Hammer"), testified that the August statement only references invoice no. 0106456 because the accounting software Singer was using at the time did not allow a statement to be generated without an invoice number. Hammer also testified that the $4,322.70 was supposed to represent the net balance of what H J owed, not the balance owing on a particular invoice. According to Hammer, the net balance reflected in the August statement was determined in April, after H J returned the rejected steel.
 {¶ 32} The question of whether the $4,322.70 figure was determined in December 2000, as testified to by Mehallis, or in April 2001, as testified to by Hammer, can be resolved by considering how the figure was determined. Mehallis testified that the figure represented the amount of steel from the October shipment actually used by H J. If this were so, then H J should have returned the unused $8,040.86 worth of steel from the October shipment plus $12,731.01 from the November shipment, which was purportedly rejected in toto, plus whatever rejected steel remained from prior shipments. The evidence of record, however, does not justify the conclusion that H J returned $8,040.86 worth of steel from the October shipment and the full $12,731.01 from the November shipment. Singer weighed all the steel returned and determined that it only amounted to $15,483.20 worth of steel. More importantly, H J's own "debit memo" reported the value of the returned steel as being $17,060.29. This is far less than the $20,771.87 that should have been returned, if, in fact, H J only used $4,322.70 of the October shipment.
 {¶ 33} The determination of the $4,322.70 figure is more plausibly accounted for as follows. In January 2001, before the bank had returned H J's check and before H J had returned the steel, Singer's accounting department generated a summary report of H J's account. According to this report, H J owed Singer $32,169.46, representing $12,363.56 for the October shipment, $12,731.01 for the November shipment, and $7,074.89 for past balances.[2] After Singer had generated this report, it credited H J with the payment of $12,363.56 for the October shipment and with $15,483.20 for the returned steel. When those credits are applied to the $32,169.46 balance, a balance of $4,322.70 remains. Because the steel was not returned until April 2001, the $4,322.70 figure could not have been determined prior to that date. Accordingly, the magistrate erred by accepting Mehallis' testimony that Shaw and Simmons determined that figure at the December 2000 meeting with Mehallis.
 {¶ 34} As demonstrated above, the evidence of record does not support the findings that the October 2000 shipment was subject to a $4,322.70 settlement or that H J rejected the November 2000 in toto. Without these findings, the only conclusion is that H J owes Singer the $20,529.54 claimed by Singer. In preparation for this litigation, Singer produced a record of the entire transaction history between Singer and H J. The accuracy of this accounting was admitted to by Ortiz. This accounting demonstrates that, prior to the disputed shipments of steel in October and November 2000, there was a running balance of $10,918.17 on H J's account. Singer is entitled to this money.
 {¶ 35} In October and November 2000, Singer shipped H J a combined total of $25,094.57 of steel. The only payment Singer has received from H J for these shipments was a check for $12,363.56 which was returned on account of the stop payment order.
 {¶ 36} It is undisputed that H J used some of the steel included in the October shipment. Ortiz claimed that the November shipment was rejected in toto. Ortiz' claim, however, is not credible in light of the other evidence in record. The weight of the November 2000 shipment alone was 44,609 pounds. It is undisputed that the steel H J returned to Singer in April 2001 was gathered from the October and November 2000 shipments plus other rejected steel from prior shipments. Singer weighed the amount of returned steel at 55,706 pounds at a value of $15,483.25. H J has never disputed the amount of the credit for the returned steel given by Singer. A "debit memo" generated by H J in December 2000 figures the amount of rejected steel from the October and November 2000 shipments to be 61,276 pounds with a value of $17,060.90. Ortiz testified that these figures reflected all the unusable steel accumulated in the course of H 
J's relationship with Singer. Of the steel returned in April 2001, Singer calculated that 22,375 pounds came from shipments prior to October 2000. Mehallis, on his visit to H J in December 2000, estimated the amount of rejected steel H J had accumulated prior to October 2000 at less than 10,000 pounds and worth about $15,000. Ortiz' claim that the November 2000 shipment was rejected in toto is contradicted by Singer's records, H J's records, and Mehallis' testimony and cannot be credited.
 {¶ 37} Singer's third and forth assignments of error have merit.
 {¶ 38} For the foregoing reasons, the decision of the Portage County Court of Common Pleas, adopting the "Magistrate's Decision and Journal Entry" and entering judgment for Singer in the amount of $4,322.70, is reversed. The case is remanded to the trial court with instructions to enter a new judgment in favor of the appellant on the issue of liability in an amount of damages to be re-determined by the trial court.
Ford, P.J., Rice, J., concur.
[1] If, in fact, there was an invoice for $4,322.70 dated November 16, 2000, it would be hard to corroborate this invoice with the finding that this figure was first determined in December 2000.
[2] Specifically, the $7,074.89 reflects an unpaid balance of $6,605.34 on invoice no. 0105861, shipped October 9, 2000, and an unpaid balance of $469.55 on invoice no. 0102986, shipped on March 11, 2000.